UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------------X
GILBERTO ORTIZ,

                            Plaintiff                          26 CV 3840

        -against-                                             COMPLAINT

THE CITY OF NEW YORK, NYPD DETECTIVE JOSEPH
W. COPE (Shield 626), and NYPD SUPERVISORS,
DETECTIVES, and OFFICERS JOHN and JANE DOES 1-10,
                                                              JURY TRIAL
                                                              DEMANDED
                            Defendants.
-------------------------------------------------------------------------------X

        Plaintiff **GILBERTO ORTIZ**, by his attorney, Joel Berger, Esq., for his Complaint alleges,

upon information and belief, as follows:

## *NATURE OF ACTION*

1       This is an action to recover money damages arising out of the violation of

plaintiff's rights under the Constitution and laws of the United States and the State of New York,

by employees of the New York City Police Department (NYPD), for the wrong-apartment NYPD

raid on his dwelling, 1470 Amsterdam Avenue, Apartment 17B, New York, NY 10027, at

approximately 5:00 A.M. on September 18, 2025. A FDNY/EMS report **[Ex. A, p.4]** reflects an

explicit NYPD admission that they raided the wrong apartment: **"PD officer states that they**

**were attempting to raid a different apartment for a warrant but accidentally raided his [Mr.**

**Ortiz's]."**   The warrant explicitly reflects that the police were not looking for Mr. Ortiz but were

rather looking for another individual, a teenager named Amir Stukes (Black, 190 lbs.). Mr. Ortiz

(light-skinned Hispanic, age 54, 320 lbs.) is not named or described in the warrant, even though

the warrant is for his apartment, # 17B. **[Ex. B]** Stukes and his family live in a different apartment

on the same floor of the NYC Housing Authority (NYCHA) building as Mr. Ortiz, at the other end of the hall from Mr. Ortiz's dwelling. NYCHA records confirm that Mr. Ortiz resides in # 17B and is the only tenant of that unit. **[Ex. C]** Stukes and his family reside in # 17E. The raid was not an "accident" such as a "wrong door" entry, but rather the result of the police recklessly ignoring an explicit requirement of the NYPD Patrol Guide mandating review the NYCHA database before seeking and executing a warrant for a NYCHA building. **[Ex. D, pp. 1,5,6]** The reports of the FDNY/EMS, Mr. Ortiz's primary care physician and the hospital to which the primary care physician had Mr. Ortiz sent by ambulance, reflect dangerously high life-threating blood pressure readings that could have been fatal to Mr. Ortiz. **[Ex. E]** Reports of Mr. Ortiz's mental health provider reflect severe Post-Traumatic Stress Disorder resulting from the botched raid. **[Ex. F]**

## *JURISDICTION AND VENUE*

2.      This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth, and Fourteenth Amendments to the Constitution of the United States.

3.      The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331 and 1343.

4.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 (b).

## *PENDENT JURISDICTION*

5.      This Court also has jurisdiction over plaintiff's state law claims, pursuant to its pendent or supplemental jurisdiction as codified in 28 U.S.C. § 1367.

6.      On September 26, 2025, within ninety days after the claims alleged in this Complaint arose, a Notice of Claim on Mr. Ortiz's behalf was duly served upon the Comptroller of defendant City of New York, pursuant to § 50-e of the NYS General Municipal Law.

2

7.      The Comptroller's office assigned the matter claim number 2025PI032332.

8.      A hearing was conducted pursuant to § 50-H of the NYS General Municipal Law on December 4, 2025.

9.      On April 10, 2026, after plaintiff had received the FDNY/EMS Report, the warrant, and all relevant medical and mental health records, a Settlement Demand was sent to the Comptroller's office accompanied by the above-referenced documents.

10.     On April 21, 2026, the undersigned plaintiff's attorney was informed in writing by a scheduling official at the Comptroller's office, Frances Sabbatino, Esq., that she was refusing to engage in any pre-litigation settlement discussion, stating that "We will be unable to conference this claim in pre litigation. The matter is better suited to resolution through the Law Department."

11.     On April 30, 2026, Ms. Sabbatino's supervisor, the Comptroller's Director of Litigation Lynell Catagena, Esq., rejected plaintiff's appeal of Ms. Sabbatino's decision.

12.     More than thirty days have elapsed since the service of the Notice of Claim, and adjustment or payment of the claim has been refused by the Comptroller of defendant City of New York.

13.     Plaintiff is commencing this action within a year and 90 days of the September 18, 2025, date on which the events of this action occurred, as required by General Municipal Law § 50-i (1) (c).

### JURY DEMAND

14.     Plaintiff demands trial by jury in this action.

### PARTIES

15.     Plaintiff **GILBERTO ORTIZ** is an Hispanic American, a citizens of the United

3

States, and a resident of the State of New York and the City of New York.

16.    Defendant City of New York operates the NYPD, a department or agency of defendant City of New York responsible for the appointment, training, supervision, promotion and discipline of all NYPD police officers, detectives and supervisory police officers.

17.    At all times relevant herein, defendant Joseph W. Cope was an NYPD Detective, Shield 626, assigned to the NYPD's Force Investigation Division. He retired as of March 1, 2026.

18.    Detective Cope was the NYPD officer upon whose application the warrant that resulted in the wrong-apartment raid on plaintiff's dwelling was obtained.

19.    At all times relevant herein, defendants John and Jane Does 1-10 were NYPD supervisors, detectives or other officers who either participated in or authorized, acquiesced in, failed to prevent or failed to report accurately the incident of this lawsuit.

20.    At all times relevant herein, defendants Cope and John and Jane Does 1-10 were acting as agents, servants and employees of defendant City of New York and the NYPD.

21.    At all times relevant herein, all defendants were all acting under color of state law

## FACTS

22.    On Thursday, September 18, 2025, at approximately 5:00 A.M., numerous officers of the NYPD broke through the door of Plaintiff Gilberto Ortiz's dwelling, 1470 Amsterdam Avenue, Apartment 17B, New York, NY 10027,

23.    1470 Amsterdam Avenue is a building administered by NYCHA.

24.    Mr. Ortiz was wearing only a T-shirt and was otherwise naked when the police broke into his dwelling.

25.    Mr. Ortiz was alone in the apartment at the time of the raid.

26. Mr. Orti is the only resident of apartment 17B.

27. Mr. Ortiz is registered with NYCHA as being the sole tenant of apartment 17B
[Ex. C]

28. Mr. Ortiz was immediately handcuffed as soon as the police broke into his dwelling.

29. Mr. Ortiz has lived in #17B for nearly 50 years, having grown up there when his parents were the residents. His name is sometimes registered as Gilberto Ortiz, Jr.

30. Mr. Ortiz has no criminal record of any kind.

31. The initial break-in was conducted by several NYPD Emergency Services Unit (ESU) officers, a heavily-armed SWAT team with shields, helmets and other riot gear.

32. The ESU officers threatened to shoot and kill Mr. Ortiz if he did not cooperate.

33. The ESU officers were joined by officers from the NYPD's Force Investigation Division including Detective Joseph W. Cope, Shield 626.

34. Detective Cope was the Force Investigation Division officer in charge of the raid.

35. Detective Cope was the NYPD officer upon whose application the warrant that resulted in the raid on plaintiff's dwelling was obtained [Ex. B]

36. The NYPD officers stated that they had a warrant, but it was not shown to Mr. Ortiz.

37. The police conducted a thorough search of the premises for approximately 45 minutes – one hour, tearing Mr. Ortiz's dwelling apart and causing substantial damage.

38. Mr. Ortiz was handcuffed for the entire period of the search.

39. After approximately 45 minutes - one hour, the police admitted that they had raided

the wrong apartment.

40.    The police stated that they were looking for a teenager named Amir Stukes who had allegedly been involved in a shooting in East Harlem a few days earlier.

41.    The police showed Mr. Orti a photograph of Amir Stukes.

42.    Mr. Ortiz recognized the teenager in the photo

43.    Mr. Ortiz explained to the officers that the teenager whose photograph they showed him lives with his family at the other end of the 17th floor hall of the NYCHA building, in Apartment 17E.

44.    The officers then proceeded to the correct apartment, # 17E, and arrested Amir Stukes

45.    Mr. Ortiz was able to identify Amir Stukes because he occasionally sees Stukes in the building.

46.    Mr. Ortiz has no relationship of any kind with Amir Stukes or his family.

47.    Detective Cope apologized to Mr. Ortiz.

48.    The Warrant obtained upon application of Detective Cope was for Apartment 17B, Mr. Ortiz's apartment. [Ex. B]

49.    The police obviously had incorrect information and recklessly failed to engage in even the most rudimentary investigation, required by the NYPD Patrol Guide, to identify the apartment in which their target actually lived.

50.    The NYPD Patrol Guide explicitly requires officers to check the online NYCHA database before seeking and executing a warrant in a NYCHA building. [Ex. D., pp. 1,5,6]

51.    The    Patrol    Guide    mandate,    PG    212-75    ("SEARCH    WARRANT

6

APPLICATIONS") states following ¶ 21: "Additional data. "Background Checks Which *Must* Be Conducted As Part Of The Search Warrant Application Process" (emphasis added) [**Ex. D, p.5**]

52.    The final paragraph of the list of "Background Checks Which Must Be Conducted As Part Of The Search Warrant Application Process" states as follows: "When warrants are to be executed within a Housing Authority Development, a 'Tenant Data Check' for the subject apartment will be conducted.  Such a check would disclose the tenant of record for the subject apartment." [**Ex. D, p.6**]

53.    Had the police obeyed the above mandate, they would have learned that teenager Amir Stukes  and his family reside in Apartment 17E and that the sole tenant of Apartment 17B is Gilberto Ortiz [**Ex. C**]

54.    The warrant explicitly states that the sole target of the raid was "Amir Stukes/male Black approximately 5'9", 160 lbs." [**Ex. B**]

55.    Mr. Gilberto Ortiz – light-skinned Hispanic, 320 lbs. -- is not named or described in the Warrant. [**Ex. B**]

56.    The Report of a NYC Fire Department Emergency Medical Services (NYFD/EMS) crew called to the scene by the police reflects an explicit NYPD admission that they raided the wrong apartment. [**Ex. A, p. 4**]

## *DAMAGES*

57.    The FDNY/EMS ambulance crew, called to the scene by the police because Mr. Ortiz was obviously in physical distress as a result of the raid, took tests and determined that Mr. Ortiz should be immediately transported by them to a hospital. [**Ex. A**]

58.    The FDNY/EMS report reflects dangerously high life-threatening blood pressure

7

readings, including one reading (6:45 A.M.) of 214/124. **[Ex. A, p. 3]**

59. The Standards of the American College of Cardiology and the American Heart Association, reflect that if the first number is above 180 and/or the second number is above 120, the patient is in a life-threatening "Hypertensive Crisis (Urgency or Emergency)."**[Ex. E]**

60. Mr. Ortiz declined to be transported to a hospital, but solely because the police had broken through the door of the apartment and if he departed before the door was fixed the apartment would be empty and subject to burglary. **[Ex. A, p. 4]**

61. Mr. Ortiz visited his primary care physician on the morning of Monday, September 22, 2025 -- only four days after the raid.

62. At that time his blood pressure reading was 240/130, even more dangerously life-threatening high than the FDNY/EMS blood pressure reading of 214/124. **[Ex. E]**

63. The primary care physician's records also reflect that psychiatric care for Mr. Ortiz was "strongly recommended." **[Ex. E]**

64. The primary care physician's office called an ambulance and Mr. Ortiz was immediately transported to Mt. Sinai-Morningside Hospital (St. Luke's Hospital) on Amsterdam Avenue in Morningside Heights. **[Ex. E]**

65. Mr. Ortiz remained in the hospital for approximately six hours, until treatment established that his blood pressure was sufficiently reduced for the hospital personnel to determine that it was safe for him to return home. **[Ex. E]**

66. Mr. Ortiz is also suffering from a severe case of Post-Traumatic Stress Disorder (PTSD), causing him to have difficulty sleeping and become scared every time he hears any noises in the hall outside his door, fearing that the police will return and break into his dwelling again.

8

67.    Mr. Ortiz's told his mental health provider (10/20/25) that "anxiety symptoms have significantly increased after a traumatic incident in which the police mistakenly raided his NYCHA apartment, damaging his door.  The event caused severe distress, hypervigilance, and sleep disturbance....[P]ersistent anxiety rated 8/10, restlessness, and intermittent palpitations." The following month's report (11/21/25) is similar: "Back in September at 5 AM the police came in saying they were going to shoot me.  I didn't have any underwear on. They broke everything in my house my apartment door my daughter's bed. There were about 20 cops and they were looking for someone else. If my dog wasn't in the cage, they would have killed my dog. I'm traumatized from this. After that, I came here for PCP and they rushed me to the hospital because my blood pressure was super high." [Ex. F]

## *THE LAW*

68. " ' [P]hysical entry of the home is  the chief  evil against which the wording of the Fourth Amendment is  directed,' " *United States v. Allen*, 813 F.3d 76, 81 (2d Cir. 2016), quoting *Payton v. New York*, 445 U.S. 573, 586 (1980). "The home has properly been regarded as among the most highly protected zones of privacy, and the sanctity of private dwellings [is] ordinarily afforded the most stringent Fourth Amendment protection." *Kerman v. The City of New York*,261 F.3d 229, 236 (2001). The Second Circuit has repeatedly emphasized this most basic principle of the Fourth Amendment. *Ayeni v. Mottola*, 35 F. 3d 680, 685 (2d Cir. 1994). *Tierney v. Davidson*, 133 F. 3d 189, 196-97 (2d Cir. 1988).

69. A reckless SWAT raid under the circumstances here is a violation of rights guaranteed by the Fourth and Fourteenth Amendments.  It cannot be trivialized and written off as a mere "mistake."  It was not an "accident," as alleged to the FDNY/EMS crew [Ex. A, p. 4], because the

9

warrant was in fact for Mr. Ortiz's dwelling **[Exs. B & C]**. Rather it was a violation of Mr. Ortiz's constitutional rights, resulting from a reckless disregard of the most basic investigative tool required of the officers from their own NYPD Patrol Guide: the mandate that the police check the NYCHA database to determine "the tenant of record for the subject apartment." **[Ex. D, pp. 1,5,6]**

70.    Police officers are not shielded from liability when in order to obtain a search warrant for a home they recklessly withhold relevant information or make false or inaccurate statements that contradict the reliability of the allegations upon which the warrant is being sought. *McColley v. County of Rensselaer,* 740 F.3d 817 (2d Cir. 2014); *Southerland v. City of New York,* 680 F.3d 127, 144-148 (2d Cir. 2012), *rehearing en banc denied,* 681 F.3d 122 (2d Cir 2012), *cert. denied,* 568 U.S. 1150 (2013); *Golino v. City of New Haven,* 950 F.2d 864, 870-72 (2d Cir. 1991), *cert. denied,* 505 U.S. 1221 (1992).

71.    Liability applies if the police "'knowingly and intentionally, or with reckless disregard for the truth, made a false statement…or omitted material information, and that such false or omitted information was 'necessary to the finding of probable cause.' " *McColley,* 740 F.3d at 823, quoting *Soares v. Connecticut,* 8 F. 3d 917, 920 (2d Cir. 1993), which in turn quoted *Golino v. City of New Haven,* 950 F.2d 864 (2d Cir. 1991).

72.    The Circuit held in *McColley* that "recklessness is inferred when the omitted information was 'clearly relevant to the determination of probable cause.'" 740 F.3d at 823.

73.    The Circuit further held in *McColley* that "any omissions … become all the more glaring because any material omission necessarily alters the 'totality of circumstances' upon which confidential information is to be assessed. Each omitted fact necessarily alters this totality." *Id.* at 824.

74.    In *McColley* the Circuit deemed it extremely important that "McColley herself was omitted entirely from the application." 740 F. 3d at 824.

75.    It is obvious from the face of the warrant itself in this case that Gilberto Ortiz was "omitted entirely from the application" as a target of the raid. **[Ex. B]**

76.    The only target of the raid identified in the warrant is Amir Stukes. **[Ex. B]**

77.    The warrant does not name or describe Mr. Ortiz. **[Ex. B]**

78.    The warrant does not reflect any allegation that Mr. Ortiz or any other occupant of apartment 17B had any relationship with Amir Stukes. **[Ex. B]**

79.    In light of the obvious gross inaccuracy in the warrant, it is inconceivable that police could have engaged in any significant inquiry to verify the reliability of the information upon which the warrant was based, as required by NYPD Patrol Guide PG 212-75, the provision requiring the police to perform a NYCHA " 'Tenant Data Check' for the subject apartment" in order to ascertain "the tenant of record for the subject apartment." **[Ex. D, pp. 1,5,6]**

80.    Compliance with the explicit mandate of PG 212-75 would have revealed that the only tenant of record for apartment 17B was an individual named Gilberto Ortiz, and that  Amir Stokes and his family lived in apartment 17E of Mr. Ortiz's building.

81.    The police raid in this case was not a "wrong-door entry," an "accident" or a "mistake," terms that might apply where the warrant was for a different apartment but the doors in the building were not clearly marked or not marked at all.

82.    The police raid in this case was the result of reckless police misbehavior, obtaining a warrant for apartment 17B when NYCHA records clearly establish that apartment 17B was not the correct apartment.

83. At the very minimum the police should have stood down rapidly after storming Mr. Otriz's dwelling and determining that he was the only occupant, instead of conducting a lengthy and destructive search of Mr. Ortiz's dwelling, since it was plainly obvious that Mr. Ortiz was not the correct target of the warrant and that apartment 17B was not the correct target of the warrant.

### FIRST CLAIM FOR RELIEF

84. Plaintiff repeats and realleges the allegations contained in ¶¶ 1-83.

85. Defendants, by their conduct toward plaintiff alleged herein, violated plaintiff'w rights guaranteed by 42 U.S.C. § 1983, the Fourth, and Fourteenth Amendments to the Constitution of the United States, Article I, §§ 1, 6, 11 and 12 of the Constitution of the State of New York, and the laws of the State of New York and the City of New York.

### SECOND CLAIM FOR RELIEF

86. Plaintiff repeats and realleges the allegations contained in ¶¶ 1-83 and 85.

87. The conduct toward plaintiff alleged herein constituted an illegal forced break-in of a dwelling, false imprisonment, unnecessary and excessive use of force, and employee negligence.

88. The conduct toward plaintiff alleged herein subjected him to trauma, shock, debasement, fright, fear, humiliation, embarrassment, loss of freedom, harassment, and physical, psychological and emotional injury, trauma, pain, and suffering.

### THIRD CLAIM FOR RELIEF

89. Plaintiff repeats and realleges the allegations contained in ¶¶ 1-83, 85, and 87-88.

90. At all times relevant herein, the individual defendants were on duty and were acting within the scope of their employment as agents, servants and employees of the City of New York, which is therefore responsible for their conduct under common law, state law, city law and Article

12

I, §§ 1, 6, 11 and 12 of the Constitution of the State of New York.

## *PRAYER FOR RELIEF*

**WHEREFORE**, Plaintiff respectfully requests judgment against defendants as follows:

(a)     Compensatory damages against all defendants, jointly and severally;

(b)     Punitive damages against all individual defendants, jointly and severally;

(c)     Reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

(d)     Such other and further relief as this Court deems just and proper.


Dated:   New York, New York
         May 8, 2026


Respectfully submitted,

**JOEL BERGER**
122 East 42nd Street
Suite 3300
New York, NY 10168
(212) 687-1425
joelberger1955@ yahoo.com

**ATTORNEY FOR PLAINTIFF**